[Crim. No. 10761. First Dist., Div. Two. June 12, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM S. WALKER, Defendant and Appellant.

## COUNSEL

Golde, Strellis & Hall, Stanley P. Golde and S. W. Strellis for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.** — Defendant appeals from an order[1] granting probation entered after a jury found him guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1) as charged. He contends that: (1) the trial court erred to his prejudice by submitting the question of justifiable homicide to the jury (Pen. Code, § 197, subd. 4), and in refusing to grant his motions for a directed verdict, dismissal or acquittal on the same grounds; (2) the trial court erred in submitting to the jury for its determination as a question of fact an issue regarding the commission of a burglary; (3) the district attorney was guilty of prejudicial misconduct; and (4) the trial court erroneously restricted his *voir dire* examination of the jury.

---

[1]The notice of appeal erroneously designates the order of February 10, 1972, as a judgment; as the court did not pronounce judgment but suspended proceedings, there is no final appealable judgment. (*People* v. *Cordova* (1967) 253 Cal.App.2d 434, 435 [61 Cal.Rptr. 327].) The notice of appeal should be construed to be from the February 10 order granting probation, which is appealable pursuant to section 1237, subdivision 1, of the Penal Code.

The record reveals the following facts: On the evening of January 24, 1970, defendant, who lived with his family at 1319 Walnut Street in Berkeley, was preparing to go out to dinner with a houseguest, Thomas Nielsen. About 9 p.m., Nielsen and the Walkers' 9½-year-old daughter, Elizabeth, were sitting on the front porch steps of the Walker residence, waiting for the others. The porch was dark. Nielsen noticed a group of four males walking and talking on the opposite side of the street. The group stopped, moved behind a bush, then crossed the street very quickly single file, in a crouched position, to take up a new hiding place behind the bushes in front of defendant's property. The group then moved between defendant's home and that of his next-door neighbor, Mrs. Camp. They disappeared past the level of the front of the Walker house. Defendant's daughter noticed them, too, at the time they crossed the street, and she became upset. Nielsen told the child to go get her father. He (Nielsen) moved down the stairs and peeked around the corner of the building. He observed figures moving in the bushes between the Walker and Camp residences.

Defendant testified that his daughter came to him and said that Mr. Nielsen wanted to speak to him outside. She sounded frightened. Walker went outside and spoke softly to Nielsen, who was still on the porch. Nielsen could hear the girl inside crying. Defendant asked Nielsen what was going on. Nielsen told defendant there were some people fooling around in the bushes. Walker left the porch and tried to look through the shrubbery that separated the Walker and Camp residences. He saw no one, and returned to the door, where his wife was. Defendant told his wife to call the police. He went inside the house, to the bathroom window, and tried to look out, but could see nothing. He then returned to the bedroom and armed himself with a rifle. He was "pretty scared," and wanted to protect himself. He went outside with the rifle, to the fence between the properties, hoping to be able to see what was happening at the Camp residence. At this point he saw three or four figures going down the Camp driveway toward the street carrying a television set. They dropped the television set and ran. Defendant cautiously followed them out to the sidewalk, and he observed three men running away, crouched over. Defendant was concerned for the safety of Mrs. Camp. He pounded on her front door and then banged on it with the butt of his rifle. He got no response to his loud banging and found the door locked. Defendant then moved to go to the rear of the Camp house but was confronted by another man who ran toward him from the shadows at the point in the driveway where the men had dropped the television set. The man was running in a crouched position with his hands out of sight under his jacket. When the man was about three to six feet from defendant, he paused, made a threatening gesture, and

said, "Don't you touch me, you ——— ——— or I'll kill you." As the man ran around the defendant and toward the sidewalk, defendant spun around and shouted at him to stop. As the man got a little farther away, defendant again shouted, "Hold it right there." When the man continued to run, the defendant raised his rifle and fired one shot at him. At this time, the victim was about 35 to 40 yards away. As it was quite dark, defendant could not see the man clearly enough to know whether he was young or old, Caucasian or of another race. He could not describe him except to say that he was an adult. Defendant fired as he believed the man might have killed somebody. He wanted to stop him. He believed that he was still dangerous. Defendant decided that Mrs. Camp was either dead or not at home.

Nielsen heard the shot and cautiously moved to the front of defendant's property. At this time, he and defendant saw a car moving rapidly and noisily backwards out of view along Walnut Street. Defendant told his wife to again call the police and to remain on the telephone. After the police arrived a few moments later, defendant spoke to them inside his home and gave the rifle to an officer. Defendant made a statement to the police later that evening in which he did not mention the victim's threatening gesture. Defendant was arrested two or three weeks later.

The body of the victim, Van Allison Holt, was found in front of 1305 Walnut Street some distance from defendant's home. The victim, a 17-year-old Berkeley High School student, died of shock and hemorrhaging from a bullet that entered the rear and exited with a gaping hole in the front of his neck.

Mrs. Camp testified that she had left her home about 6:40 that evening and returned about 10 p.m. Her house was locked when she left and was found in disarray after her return. She identified the television set, and certain other items of property strewn about the streets, as belonging to her. She also identified a knife found in the victim's pocket as one of a set of knives in her home. Defendant testified that he regarded all of the men in the group as burglars who may have harmed Mrs. Camp and whom he caught fleeing from the scene of the burglary. On cross-examination, defendant acknowledged that he had not seen the victim inside Mrs. Camp's house, that he had never seen a weapon in the victim's hands, and that at the time he fired the gun, the victim was running away from him at a distance of 35 to 40 yards. Defendant aimed the gun and shot it from his shoulder.

The prosecution's rebuttal witness, William Thomas, Jr., testified that he was one of the group of four males involved and that on the evening

in question, the entire group, including the victim, had been drinking wine. Thomas stated that the victim was intoxicated. Accordingly, the jury was instructed to consider the victim's state of intoxication in determining whether or not he had had the specific intent required for the commission of a burglary.

■ On this point defendant urges error on the part of the court in submitting to the jury for its determination the question of whether a burglary was in fact committed by the decedent. We agree with this contention.

■ It is error to submit to a jury as a question of fact an issue that on the record was one of law. (*Huebotter* v. *Follett* (1946) 27 Cal.2d 765, 770 [167 P.2d 193]; *Martin* v. *Hall* (1971) 20 Cal.App.3d 414, 421 [97 Cal.Rptr. 730]; *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 158 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].)

"All questions of law . . . are to be decided by the court." (Evid. Code, § 310, subd. (a).)

■ The evidence disclosed by the record in this case clearly demonstrated that a burglary of Mrs. Camp's home was in fact committed by the victim and his accomplices. Indeed, it was a burglary of the first degree in that it involved an inhabited dwelling house, and was committed in the nighttime; also, it appeared that the victim had armed himself with a knife during its commission. The prosecution attempted to demonstrate a diminished capacity defense as possibly affecting the victim's ability to form a specific intent to commit a burglary. In our opinion, such an attempt can only be characterized as a "red herring." The question of diminished capacity on the part of a victim is irrelevant in the context of evaluating the defense of justifiable homicide.

Before the taking of a human life will be excused, it is reasonable to require that the act in question be of serious magnitude. In short, it is reasonable to require that the act be of felony stature, rather than a misdemeanor. It is also reasonable to require a showing of necessity to take a life in order to apprehend.

But it is neither reasonable nor sensible to add an intangible, nonapparent factor into the formula. To suggest that the alleged diminished capacity of a victim can be shown to negate an otherwise valid defense of justifiable homicide would, for all practical purposes, obliterate that defense from its place in our system of criminal law.

Suppose that the felony here involved was a general rather than a spe-

cific intent crime? In that situation the defendant has no evidence concept, such as diminished capacity, to deal with and his defense of justifiable homicide is determined by the application of a reasonably objective standard, i.e., whether the overt elements of a felony were in fact present and whether—in order to apprehend the fleeing felon—the taking of his life was reasonably necessary.

The vitality of the defense of justifiable homicide should not be dependent nor contingent upon the state of mind of the victim.

It is one thing to consider diminished capacity in its role of a defensive or mitigating factor against a pending criminal charge. This is consistent with its other name—"diminished *responsibility*." It is, after all, a defense which, if raised by a defendant, is subject to attack and counterproof by the prosecution.

It is quite another thing, however, to suggest that a defendant who relies on the defense of justifiable homicide must be prepared to litigate the "diminished capacity" of one who is no longer available for either cross-examination or physical or mental examination.

We conclude that the term "felony," as set forth in subdivision 4 of section 197 of the Penal Code, and in section 837 of the Penal Code, refers to the statutory definition of such an offense and nothing more.

Even assuming, arguendo, that such defense properly could be considered in this instance, we find that the prosecutor's efforts failed since his evidence of diminished capacity was insufficient for that purpose as a matter of law. Such evidence consisted solely of the testimony of a 17-year-old accomplice, who said that the victim was intoxicated from drinking wine. There was no evidence showing the amount of the victim's intake of any alcoholic beverage, the length of time involved in its consumption, or to what degree, if any, such "intoxication" affected his mental capacity. We note, also, that although he narrated the details of a thoroughly complete autopsy, Dr. Loquvam, an expert in forensic pathology, said nothing about the presence of alcohol in the victim's body. Absent any such evidence, it is reasonable to assume that the pathologist's determination in this regard was negative. Obviously, if such evidence was available, it was incumbent upon the prosecutor to produce it. On the other hand, the accomplice, during his testimony, readily admitted that he, together with the victim and two others, discussed breaking into Mrs. Camp's house and identified the victim as the person taking certain items of personal property belonging to Mrs. Camp after they had broken into the residence. Further, it was stipulated that the victim's fingerprints had

been found on the inside of the back door of the Camp residence. Such evidence, when considered together with evidence earlier described herein, compels the conclusion that the victim and his accomplices had in fact burglarized Mrs. Camp's residence on the night in question, and that the defendant, at the time of the shooting, had reasonable cause for believing that the victim had committed a felony. Apparently the trial court was of the same mind, since it made a finding at the time of defendant's arraignment for judgment that the victim was in fact committing a burglary.[2] The situation at trial was further aggravated by the prosecutor, who, on two occasions, argued the question of diminished capacity to the jury.[3]

■ When the sufficiency of the evidence to sustain a finding of fact is contested on appeal, the issue thus presented is whether there is any substantial evidence, direct or indirect, contradicted or uncontradicted, which will support the finding. ■ To establish a fact as a matter of law, the state of the record must be such that no other reasonable conclusion is legally deducible from the evidence, and any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal. (*McBride* v. *Atchison, Topeka & S. F. Ry. Co.* (1955) 44 Cal.2d 113, 116 [279 P.2d 966]; *Church of Merciful Saviour* v. *Volunteers of America* (1960) 184 Cal.App.2d 851, 856-857 [8 Cal.Rptr. 48].) ■ "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient *substantial* evidence to support it. [Citations.]" (*People* v. *Bamber* (1968) 264 Cal.App.2d 625, 629 [70 Cal.Rptr. 662]; italics added.)

---

[2] Pages 3 and 4, reporter's supplemental transcript on appeal.

[3] At page 345, reporter's transcript:
"Miss Camp's house was burglarized. No question about it. It was entered and some things were taken from it. It was entered by some young men—boys, if you will—who had been drinking wine. His Honor is going to instruct you that the crime of burglary is a specific intent crime. In considering whether or not burglary in fact was committed—and he has to prove that a burglary in fact was committed—you can consider the state of intoxication of the parties allegedly responsible. And if they were so intoxicated at the time—and we are talking about Van Allison Holt now—as to not have been able to form the specific intent to steal within that house, he could not be guilty of burglary and, therefore, a killing on the ground of apprehension of fleeing felon is unlawful and manslaughter." Later in his argument, at page 348, reporter's transcript: "I have talked generally before about the killing of a fleeing felon; and in that connection I want you to consider the evidence carefully and consider the affect of intoxication on this 16-year old young man, on his ability to form the specific intent to commit burglary. And in that connection I want to point out also we are talking about the killing of a fleeing felon. The death penalty for a 16-year old man, who, whether wittingly—that is because of diminished capacity, because of intoxication, or unwittingly participated in a house burglary."

Although the court may have been correct in declining defendant's request for an instruction that, as a matter of law, the victim was "committing" a burglary at the time of the homicide, we are of the opinion that defendant was clearly entitled to an instruction by the court on that subject, namely, that, as a matter of law, the victim had committed the crime of burglary, a felony.

Defendant's contention that the homicide was justifiable is based upon the authority of section 197 of the Penal Code, which provides, in pertinent part, that "Homicide is also justifiable when committed by any person in any of the following cases: . . . 4. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, . . ."

On the basis of the evidence in this case, there can be no question but that, under the authority of section 837 of the Penal Code, defendant, as a private citizen, had the right to arrest the decedent: "A private person may arrest another: . . . 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

Section 840 of the Penal Code, in part, provides that "An arrest for the commission of a felony may be made on any day and at any time of the day or night." Section 841 of the Penal Code provides that "The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the authority to make it, *except when the person . . . to be arrested is actually engaged in the commission. of or an attempt to commit an offense, or the person to be arrested is pursued immediately after its commission, . . ."* (Italics added.)

Obviously, if the defendant had the right to arrest the decedent in this case, then he had the right to apprehend him for that purpose. Further, section 12031, subdivision (i), of the Penal Code, provides that "Nothing in this section is intended to preclude the carrying of a loaded firearm by any person while engaged in the act of making or attempting to make a lawful arrest."

The record in this case discloses that there was substantial, uncontroverted evidence upon which the jury might properly have accepted defendant's affirmative defense of justifiable homicide. On the other hand, if there be any well established circumstances which may be reasonably regarded as incompatible with the theory that the killing was justifiable, the jury, from a consideration of all the evidence, is warranted in a finding that the act amounted to an unlawful homicide. (*People* v. *Acosta* (1955)

45 Cal.2d 538, 541 [290 P.2d 1]; *People* v. *Mercer* (1962) 210 Cal.App. 2d 153, 159 [26 Cal.Rptr. 502].) Thus we cannot quarrel with the trial court's decision to submit the case to the jury for certain factual determinations based upon the evidence. However, the fact that the decedent had committed a burglary of Mrs. Camp's residence immediately preceding the occurrence of events with which we are here concerned was clearly established by the evidence as a matter of law, and the trial court should have so instructed the jury.

We cannot ascertain from the record upon which of the prosecution's theories the jury based its finding of defendant's guilt. One of those theories argued by the prosecutor in this case was that the homicide in this instance was not justified, on the basis that the victim did not in fact commit a burglary because of a diminished capacity to form a specific intent due to intoxication. We have concluded that the court erred in submitting this question to the jury for factual determination when, upon this record, it was one of law. Therefore, we must be able to declare a belief that such error was harmless beyond a reasonable doubt in order to affirm the conviction. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *In re Whitehorn* (1969) 1 Cal.3d 504, 512 [82 Cal.Rptr. 609, 462 P.2d 361]; *Huebotter* v. *Follett, supra.*)

Under all of the circumstances of this case and for reasons hereinbefore set forth, we are unable to so conclude. To the contrary, we find that the error was prejudicial and thus compels reversal.

While it is not necessary to the disposition of this matter that we deal with the other issues raised by the defendant in this appeal, we believe that, in the event of a retrial of the case, one point requires further comment:

Defendant contends that the trial court committed error by instructing the jury on virtually every situation in which homicide may be justified. We observe that the judge's instructions on the law of justifiable homicide were most comprehensive. We cannot agree with defendant that such instructions were misleading to the jury or that they were prejudicial to his case.

Finally, we note in passing that although the defendant was charged with the crime of "voluntary" manslaughter, the offense described in the amended information is in fact *involuntary* manslaughter, as that crime is defined in section 192, subdivision 2, of the Penal Code. The crime of voluntary manslaughter is defined in subdivision 1 of that section as "the

unlawful killing of a human being, without malice, . . . upon a sudden quarrel or heat of passion."

This error was perpetuated throughout the trial. The jury rendered its verdict finding defendant guilty of "voluntary" manslaughter. Since the punishment is identical as to both kinds of manslaughter, such an error, in itself, cannot be deemed prejudicial to the defendant. Nevertheless, it should be corrected.

The order granting probation is reversed, and the matter is remanded for further proceedings.

On June 28, 1973, the opinion was modified to read as printed above.