[No. B006751, Second Dist., Div. Five. May 19, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOHN LOUSTAUNAU, Defendant and Appellant.

**COUNSEL**

Joseph F. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Donald J. Oeser, and Jane Began Sagehorn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

ASHBY, J.—While he was in the course of burglarizing the residence of Kelli Crain, Ray Livingston, and Rick Martin on the night of January 27, 1983, appellant brutally murdered Ms. Crain with blunt force injuries to the head and numerous stab wounds. When Mr. Livingston came home, appellant hit him in the head with a hatchet. By jury trial appellant was convicted on count I of the first degree murder of Crain and the special circumstance that the murder was committed in the course of burglary pursuant to Penal Code section 190.2, subdivision (a)(17). In addition he was convicted on count II of burglary ·and on count III of the attempted murder of Livingston, with a finding he used a deadly weapon, a hatchet. On the penalty phase of the trial the jury's verdict was life imprisonment without possibility of parole, and appellant was sentenced accordingly.

Appellant was acquainted with the victims and their home. On the evening of January 27, 1983, neighbors observed appellant and his truck parked across the street from the residence at various times between 5:25 and 7:30 p.m. They saw Kelli Crain's car parked there about 7:15.

About 7:45 neighbor Mike Gonzales observed appellant carrying things from the house to his truck, including a stereo and turntable. Appellant went back into the house and the kitchen light went out.

Subsequent search of appellant's truck showed that at least by 8:15, when appellant was interrupted by Ray Livingston's arrival, appellant had already removed numerous items of property from the house to his truck, including

a stereo system with speakers and turntable, clock radio, water-ski, tool box, and Kelli Crain's wallet, jewelry, and coins in a pink purse.

Ray Livingston came home at 8:15. He observed the bedroom light was on and the kitchen light was off. As Livingston entered through the unlocked kitchen door, he was attacked by appellant who jumped on him from the washer-dryer near the door. Appellant hit Livingston on the head with a hatchet and they fell to the floor struggling.

Neighbor Mike Gonzales heard the yelling and ran to the house. He entered and found Livingston and appellant wrestling on the floor. When he turned on the light, he found blood everywhere; the kitchen "smelled like a slaughterhouse." Both men finally restrained appellant.

On the floor was Kelli Crain's body, covered by a blue pool cover which had been stored in the garage. Livingston asked appellant, "Is that Kelli? Did you kill Kelli?" and appellant replied, "I had to . . . . She had a knife."

When Mike Gonzales left to call the police, appellant reached for his pocket. Fearful that appellant was reaching for a weapon, Livingston ran out the back door. Appellant ran out the front door.

Responding police saw appellant running from the area but with the help of a police dog found appellant in a garden shed next door. He was wearing clothing belonging to Rick Martin, which was covered with blood of Kelli Crain's type. Appellant was bloody but he was not seriously injured or bleeding. Bloody clothing was also found in his truck.

The house had been ransacked. A window in the bedroom had been broken and the screen from that window was in the backyard.

Kelli Crain had suffered a crushed skull with large openings in her head. She had 13 fatal and nonfatal stab wounds, as well as defensive wounds on her left arm and right hand. Her throat had been cut from ear to ear. Her hands were tied with telephone cord.

Appellant testified in his own defense, admitting his involvement. His bizarre and incredible testimony was obviously rejected by the jury, but since appellant's main contentions concern requested instructions upon his defense, we summarize his testimony: Appellant claimed to be a regular user of PCP and to have used it on the afternoon in question.[1] He said he

---

[1] When appellant was arrested he did not appear to be under the influence of PCP or any narcotic.

had purchased cocaine from Rick Martin on prior occasions.[2] Appellant claimed he had a desire to become a police officer but because he had a prior record he thought the only way he could do so would be to impress the police with a cocaine bust. His intention therefore in entering the residence was not to steal property but to find cocaine and turn it over to the police. He entered the house by breaking a window. He searched drawers and closets and most of the house but found no drugs. He took the stereo speaker and water-ski to his truck because he thought drugs might be concealed in them.[3] He reentered the dark house and continued to search for drugs. Suddenly a tall large figure[4] appeared behind him holding a knife, yelling, "Who are you" and attacking him. They struggled, appellant trying to hold the knife away from him. Appellant picked up an iron and struck the person in the head. He started to tie the person's hands with a phone cord, but realized she was no longer moving. He covered her with the pool cover which he picked up from outside. His own clothes were covered with blood, so he removed them and put on some clothes from the house. Appellant started to leave by the back door but collided with someone coming in, who attacked appellant with an axe. Another person came in and helped subdue appellant.

## INSTRUCTIONS ON APPELLANT'S DEFENSE

The trial court gave numerous instructions requested by the defense. Although the prosecution proceeded on a simple theory of first degree felony murder and special circumstances murder committed in the course of burglary, the court, at appellant's request for instructions on lesser included offenses, instructed the jury on first degree premeditated and deliberated murder, second degree murder, voluntary manslaughter and involuntary manslaughter. At appellant's request the court instructed on trespass as a lesser included offense of burglary and on lesser assaults as included offenses of attempted murder.

Nevertheless, appellant now claims the trial court did not go far enough. He contends the court erred in refusing to give certain instructions requested by appellant on appellant's claimed issue of self-defense. We hold the trial court properly concluded appellant was not entitled to any of the requested instructions, since they did not correctly state the law as applied to the evidence.

---

[2] When the house was searched during the investigation no narcotics were found.

[3] Appellant had no explanation for all the other stolen property found in his truck, except to speculate he inadvertently gathered them up when he took his bloody clothes to the truck.

[4] Kelli Crain was five feet seven inches, one hundred thirty pounds. Appellant was five feet eleven inches, one hundred seventy pounds, had been lifting weights for five years, and had taken two classes in karate.

As to the murder and attempted murder counts, appellant contends the jury should have been instructed (1) on justifiable homicide in self-defense and (2) that even if the killing was committed in the course of burglary, it would constitute manslaughter rather than first degree felony murder, if appellant killed in an honest but unreasonable belief in necessity for self-defense. As to the special circumstance allegation that the murder was committed in the course of burglary, appellant contends the jury should have been instructed that the special circumstance does not apply if (1) appellant killed in self-defense rather than "in cold blood" or (2) if the intent to kill did not exist at the moment of entry constituting the burglary. Each of these contentions is wrong.

## FELONY MURDER AND SELF-DEFENSE

The trial court properly instructed that the unlawful killing of a human being whether intentional, unintentional or accidental which occurs as a result of the commission of or an attempt to commit the crime of burglary, and where there was in the mind of the perpetrator a specific intent to commit such crime, is murder of the first degree. (CALJIC No. 8.21; Pen. Code, § 189; *People* v. *Dillon* (1983) 34 Cal.3d 441, 465 [194 Cal.Rptr. 390, 668 P.2d 697].) The purpose of the felony-murder rule is to deter even accidental killings in the commission of designated felonies by holding the felon strictly liable for murder. (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) When a burglar kills in the commission of a burglary, he cannot claim self-defense, for this would be fundamentally inconsistent with the very purpose of the felony-murder rule. (*People* v. *Arauz* (1970) 5 Cal.App.3d 523, 533 [85 Cal.Rptr. 266]; *People* v. *Dillon, supra,* 34 Cal.3d at p. 484, fn. 29.)

Citing *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], appellant next contends that an honest but unreasonable belief in self-defense should reduce felony murder to manslaughter. This is incorrect. *Flannel* held that an honest but unreasonable belief in self-defense negates malice aforethought. (*Id.*, at p. 674.) In felony murder, on the other hand, malice aforethought is not required. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 472-477.) The trial court properly limited its *Flannel* instruction to theories of murder other than felony murder.

## SELF-DEFENSE AND TRESPASS

Appellant contends that self-defense instructions should have been given since the trial court instructed on trespass as a lesser included offense

of the burglary count.[5] He contends that based on his own testimony he was not committing a burglary but only a misdemeanor trespass, and that therefore he had a right of self-defense. He cites *People v. Hecker* (1895) 109 Cal. 451, 464 [42 P. 307], for the proposition that a property owner has no right to use deadly force against a misdemeanor trespass, and that the trespasser may defend himself. This principle is not applicable, however, in the particular circumstances of this case.

Whether appellant committed burglary or trespass in this case depended solely upon the intent within appellant's mind. The occupants' right to use deadly force in the protection of the home, on the other hand, depended upon the circumstances as they reasonably appeared to the occupants. (Pen. Code, §§ 197, subds. 2, 3, 198.) The uncontradicted evidence showed that appellant broke into the home at night. There is no evidence Ms. Crain or Mr. Livingston had any reason to believe that appellant was anything other than a dangerous burglar.[6] Their right to use deadly force to protect their home cannot, under these particular circumstances, depend upon appellant's secret harboring of a supposedly nonfelonious intent. (*People v. Walker* (1973) 32 Cal.App.3d 897, 902-903 [108 Cal.Rptr. 548].)

None of the cases cited by appellant is remotely similar in this respect. Several involve the use of deadly force to arrest a *fleeing* felon (*Tennessee v. Garner* (1985) 471 U.S. 1 [85 L.Ed.2d 1, 105 S.Ct. 1694]; *People v. Piorkowski* (1974) 41 Cal.App.3d 324 [115 Cal.Rptr. 830]) or fleeing misdemeanant vandal (*People v. Wild* (1976) 60 Cal.App.3d 829 [131 Cal.Rptr. 713]). Another involved the use of force to capture a burglar *two days after* the burglary. (*People v. Quesada* (1980) 113 Cal.App.3d 533 [169 Cal.Rptr. 593].) *People v. Ceballos* (1974) 12 Cal.3d 470 [116 Cal.Rptr. 233, 526 P.2d 241], was based primarily on public policy against a homeowner's use of a mechanical trap gun, particularly since the burglary in that case could

---

[5]Frankly, we doubt the validity of appellant's initial premise that he would not be guilty of burglary if he broke into the residence with intent to take the owner's cocaine and turn it over to police. (See *People v. Odenwald* (1930) 104 Cal.App. 203 [285 P. 406]; *People v. Walker* (1939) 33 Cal.App.2d 18 [90 P.2d 854]; *People v. Moreland* (1970) 5 Cal.App.3d 588, 592-593 [85 Cal.Rptr. 215]; *People v. Dillon, supra,* 34 Cal.3d at p. 457, fn. 5.) However, the prosecution has not raised nor have the parties briefed any issue as to appellant's original entitlement to trespass instructions, so we proceed to the issues as they have been framed by the briefs.

[6]In its thoughtful analysis rejecting appellant's requested instructions, the trial court obviously had this principle in mind when it stated: "But giving the defendant the benefit of his own testimony, it seems to me as a matter of law that he had no right to self-defense because of the situation that he voluntarily put himself in by trespassing in someone else's house. [¶] I am taking in mind that he was, according to his own testimony, a trespasser, not a burglar, because his entry, according to him, was not with the intent to steal or commit any other felony. But the homeowner in the dark wouldn't know, couldn't be a mind reader. [¶] And all the homeowner would see was somebody ransacking the house. That is a frightening experience and I don't fault the homeowner for arming herself."

not reasonably have created a fear of great bodily harm, because no one was home. In *State* v. *Sullivan* (1978) 224 Kan. 110 [578 P.2d 1108, 1118-1121], even the prosecution evidence indicated the defendants never entered the house. In *People* v. *Hecker, supra,* 109 Cal. 451, the parties were known to each other, had been engaged in a quarrel over possession of a horse of the defendant's, to which the victim claimed a lien, and, after each attempted to seize the horse's bridle, engaged in an exchange of gunfire and an outdoor chase.

Here, even appellant's version indicated he forcibly broke into a home at night and was suddenly confronted by the startled resident while he was ransacking the place.[7]

Finally, appellant cannot have been prejudiced by the denial of self-defense instructions dependent on his trespass theory, since in finding appellant guilty of burglary rather than trespass on count II, the jury necessarily resolved that issue against appellant. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)[8]

## Special Circumstances

■ Appellant contends the court should have instructed the jury that in order to find true the special circumstance that the murder was committed in the course of burglary, the jury must find that appellant had the intent to kill at the time he entered the residence. There is no such requirement. Penal Code section 190.2, subdivision (a)(17)(vii), requires by its terms only that the murder be committed while the defendant was engaged in the commission of, or attempted commission of, or the immediate flight after committing or attempting to commit burglary. As interpreted in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 153 [197 Cal.Rptr. 79, 672 P.2d 862], the statute requires intent to kill, but there is no basis for concluding

---

[7]This conclusion, that there is no triable issue as to the occupants' right to use deadly force in the protection of their home, is based upon the uncontradicted evidence in this particular case. We note however, that in 1984 the Legislature enacted the Home Protection Bill of Rights, (Stats. 1984, ch. 1666, §§ 1, 2, p. —), Penal Code section 198.5, which creates a legal presumption to similar effect: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred. [¶] As used in this section, great bodily injury means a significant or substantial physical injury."

[8]Appellant contends the jury could have based the burglary verdict on his first entry into the house but could have believed his second entry was nonburglarious. There is no basis in the evidence for such a distinction.

the intent must exist at the time of entry. This would be inconsistent with the provision that an intentional killing during flight from the crime is sufficient. (See CALJIC No. 8.81.17 (1984 rev.).)

■ Citing *People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468], appellant next contends the special circumstance does not apply unless the victim was killed "in cold blood." His reliance on *Green* is misplaced, because the court was there construing the *prior* death penalty law enacted in 1977 which applied only to "willful, deliberate and premeditated" murder during the commission of designated felonies. (*Id.*, at pp. 11, 49, 61.)

The present death penalty law, enacted by initiative in 1978, eliminated any requirement that the murder be "willful, deliberate and premeditated." (*Carlos* v. *Superior Court, supra,* 35 Cal.3d at pp. 138-140, 143.) The killing must be intentional (*id.*, at pp. 153-154) but there is no requirement that it be "in cold blood."[9]

■ Finally, appellant miscites *People* v. *Turner* (1984) 37 Cal.3d 302, 328 [208 Cal.Rptr. 196, 690 P.2d 669], for his contention that the special circumstances statute does not apply if he killed in self-defense in the commission of burglary. *Turner* was tried before *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, and the cited portion of *Turner* discusses the prejudicial effect of the trial court's failure to instruct as required by *Carlos* that the felony-murder special circumstance requires *intent to kill.* In that context the Supreme Court said, "We cannot speculate as to what defenses might have been presented if the intentions of the perpetrator at the time of the killings had been relevant. Defenses of diminished capacity and self-defense, alluded to in Souza's testimony, were not developed. There may have been no evidence to support these or other defenses which go to mitigation of the intent to kill, but we cannot assume on this record that none exists."

The reasoning of *Turner* is apparent. A defendant in the course of burglary might kill the victim, without an actual intent to kill, if he acted reflexively

---

[9]The jury was instructed, consistent with *People* v. *Green, supra,* 27 Cal.3d 1, and *Ario* v. *Superior Court* (1981) 124 Cal.App.3d 285, 288-289 [177 Cal.Rptr. 265], cited by appellant, that the killing must be committed in order to carry out or advance the commission of the crime of burglary or to facilitate the escape therefrom or to avoid detection, and that the special circumstance is not established if the burglary was merely incidental to the commission of the murder. The jury was also instructed, consistent with *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131 that intent to kill is required. (See CALJIC No. 8.81.17 (1984 rev.).)

Appellant is attempting to revive the additional requirement of the 1977 law that the murder also be willful, deliberate and premeditated, or in his words "in cold blood." This argument is contrary to the history of the 1978 initiative as described in *Carlos* v. *Superior Court, supra,* 35 Cal.3d at pages 138-140, 143.

in self-defense or only with intent to disable. In a case tried before *Carlos,* where the parties did not realize and the jury was not instructed that intent to kill was an issue, self-defense might have been relevant to that issue. *Turner* says only that self-defense might "go to mitigation of the intent to kill," and that a case tried without proper *Carlos* instructions must therefore be retried.[10] *Turner* does *not* say that self-defense would prevent a finding of special circumstances for an *intentional* killing in the course of burglary.

The instant case is therefore distinguishable because it was tried after *Carlos* under proper *Carlos* instructions that the finding of special circumstances requires intent to kill. The jury by its verdict found that appellant had intent to kill. All the elements for a finding of special circumstances were satisfied, and it makes no difference whether the intentional killing in the course of burglary was in claimed self-defense.

## ATTEMPTED MURDER

Appellant was convicted of attempted murder of Ray Livingston on count III. A hatchet was kept near the washer and dryer. When Ray Livingston entered the residence through the kitchen door, appellant, standing on the washer-dryer, jumped on him and struck Livingston in the head with the hatchet during their struggle.

■ Appellant contends the court committed reversible error in its instructions on attempted murder. The court twice instructed the jury that attempted murder requires a specific intent. The court said the specific intent was included in the definition of the crime. In the course of defining murder, in the language of CALJIC Nos. 8.10 and 8.11 (1983 rev.), requested by appellant, the court gave both definitions of malice aforethought, express and implied.[11] Insofar as this definition might have been applied to attempted murder, it was partially erroneous. Since attempted murder requires specific intent to kill, the definition of implied malice should have been omitted in

---

[10]To similar effect see *People* v. *Whitt* (1984) 36 Cal.3d 724, 735 [205 Cal.Rptr. 810, 685 P.2d 1161]; *People* v. *Anderson* (1985) 38 Cal.3d 58, 62 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Hayes* (1985) 38 Cal.3d 780, 787-788 [214 Cal.Rptr. 652, 699 P.2d 1259]; *People* v. *Ratliff* (1986) 41 Cal.3d 675, 698 [224 Cal.Rptr. 705, 715 P.2d 665].)

[11]CALJIC No. 8.11 provides in pertinent part: "'Malice' may be either express or implied. [¶] [Malice is express when there is manifested an intention unlawfully to kill a human being.] [¶] [Malice is implied [when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life] [or] [when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life].]"

relation to the attempted murder count. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446].)

However, *Murtishaw* holds that an erroneous reference to implied malice in an attempted murder case may be harmless error under "the test of prejudice established in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]—whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error . . . ." (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 765.) The Supreme Court has never disapproved that test for harmless *Murtishaw* error. (See *People* v. *Ratliff, supra,* 41 Cal.3d at pp. 695-696.)

In the particular circumstances of this case it is highly unlikely that the jury erroneously convicted appellant of attempted murder on an implied malice theory. When the prosecutor argued count III to the jury, he referred only to the "intent to kill" portion of the definition of malice aforethought. At appellant's request the court instructed the jury as to count III on lesser included offenses of assault with a deadly weapon, assault by means of force likely to produce great bodily injury, and simple assault. These instructions informed the jury that assault requires only a general criminal intent. The jury had been instructed that attempted murder requires a specific intent. If the jury had believed that appellant had anything less than intent to kill as argued by the prosecutor, the jury would have returned a verdict of one of the lesser assault charges, which required only general criminal intent. Thus the manner in which this issue was presented to the jury in argument and instructions on lesser offenses makes it highly improbable that *Murtishaw* error adversely affected the verdict. (See *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 982-983 & fn. 2 [191 Cal.Rptr. 408]; see also *People* v. *Wright* (1985) 39 Cal.3d 576, 589 [217 Cal.Rptr. 212, 703 P.2d 1106].)

## PROSECUTOR MISCONDUCT

 Appellant contends that in his rebuttal argument to the jury the prosecutor committed misconduct by accusing defense counsel of fabricating a defense. There is no merit to this contention. Taken in context, the prosecutor's remarks were a legitimate reply to the argument of defense counsel, and in any event did not prejudicially affect the verdict.

Appellant presented a diminished capacity defense based on use of PCP. He had been interviewed several times by several psychiatrists. The prosecutor argued that appellant should not be believed because he made inconsistent statements in these interviews. *Defense counsel* argued to the jury that appellant had been reluctant to tell the whole story in earlier interviews and that the reason appellant told a more complete story in later interviews

was that he, defense counsel, had advised appellant to cooperate fully and to confide everything to the psychiatrist.[12]

The rebuttal argument of the prosecutor to which appellant objects was "[Counsel for defendant] had some sort of implication that was rather confusing to me, in that he said that when the defendant talked to the doctors, at first he doesn't tell his story all the way or completely or he didn't use the word honestly. [¶] But I think we can use that word. It's not until he talked to [his counsel] that he then goes back and tells these other stories. [¶] Now, what do we draw from that? That the defendant does what [his counsel] tells him to do?"

*People* v. *Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564], cited by appellant, states that the prosecutor should not imply that defense counsel fabricated a defense *where there is no evidence to support that claim*. Here it was defense counsel's own argument which had injected the issue of defense counsel's advice to appellant to tell everything to the psychiatrist, and in this peculiar context the prosecutor's reply did not exceed the bounds of propriety.

In any event the matter was immediately cleared up. Defense counsel objected in front of the jury and the prosecutor clarified that he was attacking appellant, not defense counsel. "[Counsel for defendant]: I am going to object, your Honor. [¶] I believe that is an attack on my reputation, in . . . that I would tell him to lie or do something contrary in this court. [¶] I don't think that is appropriate. [¶] THE COURT: You weren't implying that, [counsel for the People], were you? [¶] [Counsel for the People]: I certainly was not, your Honor. [¶] THE COURT: All right, go ahead. [¶] [Counsel for the People]: I am implying just the opposite. [¶] I am implying that the defendant has a supply of stories that he can tell and he has told us a supply of stories. [¶] He has told a number of different stories to the doctors."

Appellant has not sustained his burden of showing a reasonable probability that the remark affected the outcome of the trial. (*People* v. *Bain, supra,* 5 Cal.3d at p. 849.)

---

[12]"But I have to tell you I thought Dr. Sharma was a better defense witness than Dr. Markman, who I called, because Dr. Sharma told you clearly, after I told Mike Loustaunau that he could cooperate fully with Dr. Sharma and to confide everything in him, everything about this case, Dr. Sharma told you Mike Loustaunau was then much more cooperative in giving out a lot more information than he gave out the two preceding times and told him what happened that evening. [¶] Do you think it is unreasonable to believe that a person would not be hesitant to talk to somebody who is judging them when their life is on the line about this kind of a case? [¶] Of course they are going to be hesitant about talking to somebody. They don't know who they can talk to and who they can't. [¶] But Dr. Sharma confirmed upon instructions by his counsel, by me, Mike Loustaunau then cooperated fully with him, providing information and told him everything on that third visit and part of the fourth."

## Cruel or Unusual Punishment

Citing *People v. Dillon, supra,* 34 Cal.3d 441, 479, appellant contends that the imposition of sentence of life imprisonment without possibility of parole constitutes cruel or unusual punishment as applied to this case. There is no merit to this contention. Appellant's argument in this respect is based on his own version of the facts which the jury obviously rejected. The burglary verdict, and the falsity of appellant's claim that he entered the residence for some other purpose, were overwhelmingly established by the vast amount of stolen property appellant removed to his truck. The jury did not believe that appellant's ability to harbor the specific intent required was diminished by the use of PCP. Appellant's claim that this was not "a cold-blooded killing" is belied by the massive and brutal wounds of the victim and her tied hands. Appellant's claim that he acted in self-defense was contradicted by the nature of Kelli Crain's wounds and the testimony of Ray Livingston, whom appellant unsuccessfully attempted to kill with a surprise attack and a hatchet blow to the head. As supported by the prosecution evidence, the circumstances of this crime very well fit a pattern the people of California must have had in mind when, in enacting Penal Code section 190.2 by initiative in 1978, they made an intentional killing in the course of burglary one of the offenses subject to the maximum penalty.[13]

With respect to the nature of the offender (*People v. Dillon, supra,* at p. 479), although appellant had no significant prior convictions, he was 31 years old and had been involved with drugs for a long time, leading to violent and unacceptable behavior.

Aggravating factors and the finding of special circumstances are amply supported by the record. Of the two alternatives following a finding of special circumstances, death or life imprisonment without possibility of parole, appellant received life. Nothing about the circumstances of the crime or of the offender in this particular case compels the conclusion that the punishment provided by law would be so disproportionate to the crime or the offender's culpability that it would shock the conscience and offend fundamental notions of human dignity. (*People v. Dillon, supra,* 34 Cal.3d at p. 478; see *People v. Juarez* (1984) 158 Cal.App.3d 412, 415-417 [204 Cal.Rptr. 637]; *People v. Munoz* (1984) 157 Cal.App.3d 999, 1015-1016 [204 Cal.Rptr. 271].)

---

[13]For the reasons we have stated, appellant's claim of self-defense was not a valid defense to the findings of either first degree felony murder or special circumstances. In *Dillon* the record supported a conclusion of a rash killing by an unusually immature youth in perceived self-defense, and this was considered by the Supreme Court as one factor relevant only on the constitutional issue whether the sentence constituted cruel or unusual punishment in the particular circumstances of the crime. (*People v. Dillon, supra,* 34 Cal.3d at p. 488.) Here, however, the evidence overwhelmingly rebuts the claim of self-defense.

The judgment is affirmed.

Feinerman, P. J., and Eagleson, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 21, 1986.