Filed 3/2/16  P. v. Delgado CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>FELIPE JESUS DELGADO,<br><br>　　Defendant and Appellant. | G049698<br><br>(Super. Ct. No. 12ZF0155)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Eric A. Swenson, Lynne B. McGinnis, and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Felipe Jesus Delgado guilty of first degree murder and robbery, and found true the special circumstance of murder committed during a robbery. The court imposed an indeterminate term of life without the possibility of parole for murder and stayed sentence for robbery.

Defendant argues substantial evidence supported giving jury instructions on self-defense, voluntary manslaughter on a theory of imperfect self-defense, and theft as a lesser included offense of robbery. We reject defendant's assignments of error and affirm the judgment.

**FACTS**

1. *Prosecution Evidence*

Around 10 p.m. on July 4, 2012, Daniel Rowlett drove a large flat bed truck from his neighborhood block party to Mister Packaging, his packing and shipping business located on North Olive Street in Anaheim. Rowlett was a middle-aged man, about 6 feet tall, and 225 pounds. On that day, he carried his wallet, a red Swiss Army knife, a pair of reading glasses, and other assorted personal items.

About 30 minutes later, witnesses saw Rowlett's truck hit a concrete light standard that marked the entrance to an alley off East La Palma Avenue, a cross street of North Olive Street. The crash occurred around the corner and about a quarter of a mile away from Mister Packaging.

An Anaheim police officer arrived at the crash site to find a group of people surrounding Rowlett's truck, and Rowlett slumped over the driver's seat, clutching an open flip phone. The officer saw "a lot of blood," inside the truck cab, and more blood dripping from the cab to the pavement. The officer also noticed that Rowlett's left pant leg was torn in two places, and there was a lot of blood coming from what appeared to be stab wounds. When the officer got into the truck, he saw another stab wound in Rowlett's chest. The officer checked for vital signs, but there were none.

2

Minutes later, paramedics took Rowlett to a hospital.  He died as a result of massive blood loss from 14 stab wounds, 13 wounds in his left leg, side, and arm and one to the chest.  One of the leg wounds was six inches deep and severed Rowlett's left femoral artery.  The chest wound was three and one-half inches deep, and the knife had nicked Rowlett's sixth and seventh ribs.

One of the witnesses who had been parked in the alley, told investigators that he saw a man in a white shirt run up the alley and jump a block wall at its end moments before Rowlett's truck crashed.  Officers also discovered a blood trail leading away from the crash site, up the alley, and over the block wall.  A canine officer followed the blood trail from the block wall through a vacant lot fronting East Julianna Street, which is also around the corner from Mister Packaging, and to the house where defendant lived with his girlfriend, Brenda Ruiz, and Ruiz's baby.

Several police officers responded to the home.  They found defendant with Ruiz's baby in one of the bedrooms, and a white, blood-stained shirt, Rowlett's wallet, and a knife on the bedroom floor.  There was a second knife between the mattress and box spring in the room.  DNA testing revealed a mixture of defendant's and Rowlett's blood on the second knife.

Ruiz told police that defendant had left their apartment between 9:00 p.m. and 10:00 p.m.  When he returned about an hour later, defendant had a cut on his right thumb and blood on his clothing.  She said defendant told her that he had either attempted to rob someone, or took a robbery victim's wallet.

Meanwhile, police officers at Mister Packaging discovered Rowlett's Swiss Army knife in the closed position and his reading glasses lying in the driveway.  The gate to the driveway had been left open, and there was a blood trail leading away from the driveway and toward La Palma Avenue.  One officer followed the blood trial to La Palma Avenue.  Along the way, he saw a parked Dodge Durango with a broken passenger window, and he could see the crash from the intersection.

2. *Defense Evidence*

        a. *Ruiz*

Ruiz testified under a grant of immunity.  She admitted seeing blood on defendant's knife and hiding it under the mattress at his direction.  Ruiz said defendant told her he had demanded Rowlett's money, Rowlett had exclaimed, "I don't have anything," and defendant stabbed him.  Ruiz also testified defendant did not usually drink alcohol, but he was drunk and high on marijuana the day of the murder.  Also, during a recorded jail conversation between Ruiz and defendant, defendant admitted he "fucked up," and "this was all for the fucking money."

        b. *Defendant's Testimony*

Defendant, who was about 21 years old at the time of the crime, stood five feet, five inches tall, and weighed about 180 pounds, testified on his own behalf.  He said he drank at least 18 cans of beer and smoked marijuana throughout the afternoon of July 4, 2012.  He spent the day at home, but he later decided to go out, break car windows, and steal whatever he could find.  He admitted breaking the window of the Dodge Durango parked on North Olive Street, but he denied taking anything from it.

Defendant explained that after he broke the Durango's window, he looked across the street and saw a big truck in the Mister Packaging driveway.  He thought there might be valuable tools inside the truck, so he walked across the street to take a look.  Defendant said that Rowlett's truck was unattended and one of the doors was slightly ajar.  He decided to get inside the truck and attempt to remove the stereo using the knife he brought with him for that purpose.  While he worked on the stereo, perhaps cutting his thumb in the process, defendant noticed a wallet in the front seat.  He decided to take the wallet and walk away.

Defendant testified he was about 10 to 15 feet away from the truck when Rowlett came up from behind him and punched him in the back of the head.  As defendant described it, he reacted to Rowlett's battery by turning around and swinging

4

his knife at Rowlett. When defendant's attorney asked him if he thought he had hit Rowlett, defendant replied, "Yeah." When asked where he thought he connected with Rowlett's body, defendant said Rowlett's chest.

At stabbing Rowlett, defendant turned to run, but he tripped and fell to the ground. While he was down, Rowlett, who was physically much larger than defendant, grabbed him, held him down, and repeatedly hit him with a strap.[1] Defendant explained that during this struggle he managed to get one arm free and repeatedly stabbed Rowlett in the side. Defendant was not sure how many times he stabbed Rowlett, he thought perhaps three or four times, but when Rowlett collapsed, defendant got up and ran. He said he ran around the corner and in the opposite direction of his house in an effort to escape.

Defendant explained that when he got to the intersection of North Olive Street and La Palma Avenue, he glanced back and saw Rowlett's truck coming toward him. Defendant said he picked up his speed, turned into the alley, jumped a block wall, and ran home. He claimed to have told Ruiz that he broke into a truck and took a wallet, not that he committed a robbery. After talking to Ruiz, defendant took off his clothes, washed himself, "went to bed and . . . passed out." Sometime later, police officers arrived at his door and arrested him. Still later, someone told him Rowlett died.

Defendant admitted needing money and trying to hide the cut on his thumb from police, but he denied taking Rowlett's wallet from Rowlett. As he testified, "I did know what I was doing, but, I mean, I wasn't thinking."

c. *Expert Testimony*

Francisco Gomez, a forensic psychologist and researcher with a doctorate in philosophy, interviewed defendant, reviewed his school records, and used a battery of

---

[1] A photograph taken at the time of defendant's arrest (exhibit A) shows red marks on his chest.

psychological tests to evaluate defendant's cognitive functioning. Based on the results, Gomez testified defendant has below average intelligence, and he suffers from an unspecified neurocognitive disorder and alcohol abuse disorder. According to Gomez, this combination of challenges makes it difficult for defendant to process information, which means he tends to plan poorly and act impulsively, and it is difficult for defendant to learn from past experiences. Gomez further testified alcohol and drug abuse exacerbate defendant's neurocognitive disorder.

## DISCUSSION

### 1. *Jury Instructions*

#### *a. Case Theories*

The prosecutor argued defendant committed first degree felony murder when he killed Rowlett in a classic robbery gone awry. Referring to Ruiz's testimony, the prosecutor asserted the evidence showed defendant demanded Rowlett's wallet at knife point, and when Rowlett denied having anything to steal, defendant repeatedly stabbed him and left him to die. In the prosecutor's words, "Mr. Delgado hit[] Mr. Rowlett up. Give me your wallet. Mr. Rowlett says, 'I don't have anything. I don't have anything.' Bam, he gets stabbed with a knife 14 times."

Defense counsel argued his client did not use force or fear to take Rowlett's wallet. Rather, defense counsel asserted defendant committed a theft by taking Rowlett's wallet from his unattended truck. Pointing to Gomez's expert testimony, and evidence of his client's intoxication, counsel also argued defendant acted impulsively when Rowlett attacked him rather than from any preconceived plan to commit robbery and murder. Defendant admitted taking the wallet (a theft), but denied committing a robbery. And, he argued Rowlett used unreasonable force in an attempt to reclaim his property. In this way, defendant argued he used deadly force in self-defense during the commission of a theft, and not that he caused a death during the commission of a robbery.

6

In keeping with the facts and the parties' legal theories, the court instructed on first degree robbery-murder, felony-murder, robbery, attempted robbery, voluntary intoxication, and the robbery-murder special circumstance. With respect to robbery, CALCRIM No. 1600 advised the jury that the People must prove beyond a reasonable doubt that defendant took property in the possession of another, from that person's immediate presence, against their will, and did so using force or fear. The instruction also advised the jury that defendant's intent to take the property must have been formed before or during the time he used force or fear, and "If the defendant did not form [the intent to steal] until after using the force or fear, then he did not commit robbery."

On the duration of a robbery, the instruction stated, "[a] robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property. [¶] A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property."

The court also gave the following instruction at the request of the defense: "A person may detain another person in a reasonable manner whenever the person has cause to believe the person to be detained is attempting to unlawfully take or has unlawfully taken property from . . . that person. [¶] In making the detention that person may use a reasonable amount of nondeadly force necessary to protect himself and to prevent escape of the person detained or the loss of property. [¶] However, if you find that person used an unreasonable or excessive force in making the detention, the person being detained has no duty to refrain from using reasonable force to defend himself against the use of excessive force."

*b. Defendant's Argument*

The defense did not request jury instructions on theft, self-defense, or voluntary manslaughter based on imperfect self-defense. Nevertheless, defendant asserts substantial evidence triggered the court's duty to give these instructions without a request. In the alternative, defendant argues trial counsel's failure to request these instructions constitutes ineffective assistance of counsel. We disagree with both points.

In a criminal case, with or without a request from the parties, the trial court must instruct on "'the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239.)

We review de novo the question whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Walker* (2015) 237 Cal.App.4th 111, 115.) In so doing, we consider the evidence in the light most favorable to the defendant to determine if substantial evidence supports the requested instruction. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) "'"Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed'" (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

In this case, looking *only* at defendant's versions of the events, which is by no means the most probable, there was no substantial evidence defendant committed any less than robbery. Defendant testified that he was about 10 to 15 feet away from the truck when Rowlett punched him in the back of the head. He said that he reacted to Rowlett's manual assault by turning around and swinging his knife at him. When asked if he hit Rowlett with the knife, defendant replied, "Yeah." When asked where he thought he connected with Rowlett's body, defendant said he thought it was his chest.

8

Thus, even in the light most favorable to the defense, the evidence shows defendant took Rowlett's wallet and then stabbed him to keep it. When force or fear is used to retain recently stolen property from its owner the crime is robbery. (*People v. Gomez* (2008) 43 Cal.4th 249, 256-257; *People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8; *People v. Estes* (1983) 147 Cal.App.3d 23 (*Estes*).

Whether defendant removed Rowlett's wallet from his person, or merely grabbed it out of Rowlett's unattended truck, defendant had possession of Rowlett's wallet when Rowlett hit him in the head. Defendant admits he reacted by stabbing Rowlett with a knife. That is a classic *Estes* robbery. (*Estes*, *supra*, 147 Cal.App.3d at pp. 26-27.)

Furthermore, under the felony-murder rule, malice is implied from the intent to commit an inherently dangerous felony that actually results in death. (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) As the court in *Dillon* observed, "first degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People v. Dillon* (1983) 34 Cal.3d 441, 477.)

In short, the prosecution was not required to prove malice because the purpose of the felony-murder rule is the deterrence of *accidental* killings during the commission of certain designated felonies. (*People v. Loustaunau* (1986) 181 Cal.App.3d 163, 170; *People v. Robertson* (2004) 34 Cal.4th 156, 164-165, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.).) Consequently, even based on defendant's testimony, he committed a robbery and first degree felony murder, and the felony-murder rule precluded instructions on self-defense, reasonable or

9

unreasonable. (*People v. Dillon*, *supra*, 34 Cal.3d at pp. 475-476; *People v. Seaton* (2001) 26 Cal.4th 598, 665; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 958-959, abrogated on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 107.)

In sum, there is no evidence defendant committed any theft other than a robbery and there is evidence he killed Rowlett during the commission of that robbery. That is first degree felony murder. (*People v. Anderson* (2006) 141 Cal.App.4th 430, 448 ["'When the evidence points *indisputedly* to a homicide committed in the course of a felony listed in section 189 . . . , the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder'"].) Consequently, the trial court had no duty to give instructions on theft, self-defense, or voluntary manslaughter based on imperfect self-defense. Because we conclude there was no instructional error, we also reject defendant's related ineffective assistance of counsel claim.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.


10