Filed 12/24/14  P. v. Valerio & Kelly CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NICHOLAS DIOGENES VALERIO and JARRELL KELLY,<br><br>    Defendants and Appellants. | G047217<br><br>(Super. Ct. No. 08NF4115)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Nicholas Diogenes Valerio.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Jarrell Kelly.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Early one morning in 2006, gunfire erupted in the parking lot of a Denny's restaurant in Anaheim. When the shooting stopped, Armand Jones, a promising young actor, was dead, and Ronnell Spencer, one of Jones's friends and a clothing store owner, was wounded. The shooting followed an armed robbery in the men's restroom of the Denny's. Yolanda Brown, Stanley Simon, Charles Reynolds, Jarrell Kelly and Nicholas Diogenes Valerio, associates or members of the Rollin 20's criminal street gang, were prosecuted for robbery, murder, attempted murder, and street terrorism.

Valerio and Kelly (defendants) were convicted by a jury of first degree murder, premeditated attempted murder, two counts of robbery and active participation in a criminal street gang.[1] The jury found additional allegations of felony-murder and gang-related murder special circumstances, being active participants in a criminal street gang, vicariously discharging firearms and causing great bodily injury and death, and committing all crimes for the benefit of, at the direction of, or in association with the Rollin 20's criminal street gang. The trial court sentenced both defendants to life without the possibility of parole (LWOP), plus indeterminate life terms of 20 or 25 years for the gun use.

Defendants challenge the sufficiency of the evidence to prove the special circumstances findings. They also claim the trial court committed several instructional errors, erroneously denied their new trial motion based on newly discovered evidence, and made several sentencing errors.

We conclude sufficient evidence supports the felony-murder special-circumstance finding as to both defendants. However, the Attorney General concedes

_____

[1] Brown, Simon and Reynolds were separately tried and convicted. (*People v. Brown* (Aug. 28, 2013, G046404) [nonpub. opn.] review denied Dec. 13, 2013; *People v. Simon* (Aug. 28, 2013, G045927) [nonpub. opn.] review denied Dec. 12, 2013; *People v. Reynolds* (Sept. 5, 2013, G046121) [nonpub. opn.] review denied Dec. 12, 2013.)

and we agree, as to Valerio the gang-related murder special circumstance must be reversed for insufficient evidence. In all other respects, Valerio's convictions are affirmed. Nevertheless, with respect to Valerio, we conclude the trial court should be permitted to consider the constitutionally of his LWOP sentence in light of his relatively minor criminal record, youth, and subordinate role during the robberies.

The parties all agree the trial court made several sentencing errors as set forth below. As to Kelly, the judgment is modified to address those sentencing errors, and affirmed as modified. As to Valerio, if the trial court determines on remand his current sentence is constitutional, his sentence must also be modified.

## FACTS

*1. Background*

On the night of March 16, 2006, Dwayne Washington, Armand Jones, Giovanni Boyd, and Brent Hurd went to the Boogie nightclub in Anaheim. Jones, Washington, and Boyd were wearing gold chains and diamond stud earrings. Jones also had an expensive watch, and Washington was wearing some popular and expensive shoes. They were celebrating the fact Jones had just finished working in a movie entitled, *Freedom Writers*. They were not members of a criminal street gang, nor were they armed.

On the same night, another group of people met at the Boogie nightclub. Ebony Aguilar, Damon Hill and Kalup Hartley drove to the Boogie in Hill's Camaro. Once there, they joined Kelly, Brown and Reynolds. Hill, Kelly, Brown and Reynolds were either members or associates of the Rollin 20's criminal street gang, and at least two members of this group carried guns.

After the Boogie nightclub closed, both groups ended up at a nearby Denny's. The restaurant was crowded so Jones and his friends paid the Denny's manager $20 to get seated ahead of a number of other people. A group of women complained, and

3

the guys invited them to join them at their table. Ronnell Spencer, the owner of a clothing store Jones frequented, also sat down with them.

After some period of time, Washington and Boyd decided to go to the restroom. Brown, Kelly, Reynolds, Simon, Hill, and Valerio followed them into the restroom a few minutes later. Hill or Kelly had a .357- or .38-caliber revolver, and Reynolds and Simon had a .357- or .38-caliber revolvers.

Brown and another man approached Washington and said, "Give me your chain, cuz. Give me all your stuff." A third male, Simon, pointed a gun in Washington's face. Washington looked around, and he saw and recognized Kelly. Washington said, "I know you . . . you gonna let your boys do this to me?" Simon asked Kelly, "You know this dude, cuz?" Kelly, who Washington testified was unarmed, said, "no." Brown and an unidentified man went through Washington's pockets, and took his cell phone, the gold chain from around his neck, and his shoes while Simon pointed a gun at Washington's head and threatened to shoot.

Brown left the restroom, while three men, including Valerio, forced their way into Boyd's stall just as Boyd opened the door. Valerio asked Boyd where he was from. Boyd understood this to be a gang challenge, and he replied, "No, no, I don't bang." Valerio demanded Boyd give him "all [his] shit." Boyd took off his shoes and necklace and handed them to Valerio. Valerio walked out of the stall as Hill came in. Hill pointed a silver semiautomatic gun at Boyd and told him to empty his pockets. Hill took Boyd's car keys, cash, and cell phone. Boyd also said he heard someone say, "This is 20's," during the robbery, and he knew there was a Long Beach criminal street gang known as the Rollin 20's.

Brown quickly returned to the restroom and said someone else "with chains" on was coming. She walked back out and Jones walked in. As Jones opened the door, he saw Washington with his hands up and asked what was happening. Reynolds pointed a gun at Jones and said, "give me your chains, cuz." Jones refused. He hit

4

Reynolds and a brief scuffle ensued just before everyone ran out of the restroom. The robbers headed outside the Denny's with Jones hot on their trail.

Washington tried to warn Jones about the guns, but he could not catch him. Spencer jumped up from his table, ran through the Denny's entrance, and then outside after Jones. Spencer produced a gun from somewhere, raised it over his head, pointed it in the general direction of Jones's attackers, and fired several shots. Jones's attackers returned fire, and Washington saw Jones stumble back through the Denny's front door. Jones asked his friend for help and then fell to the floor. Washington said Jones coughed up some blood and died. Later, everyone learned that someone had shot Spencer in the head during the gun battle.

Investigating officers collected several bullets, bullet fragments, and cartridge casings from the Denny's parking lot. The parties stipulated the bullets, bullet fragments, and cartridge casings came from four different guns. The evidence indicated Spencer fired a Glock .45-caliber handgun several times, Jones had been killed with a one of two .357- or .38-caliber handguns, and another person filed a single nine-millimeter cartridge. The nine-millimeter gun turned up about two weeks after the shooting. It was recovered by the Torrance Police Department during an investigation into another shooting incident. As the police later discovered, during this gun battle, Kelly was shot and Hill was present at the scene.

2. *Defendants' Statements*

In May 2010, Valerio submitted to police questioning after advisement of his *Miranda* rights.[2] He admitted having "LB" and "East Side Long Beach" tattoos. He denied belonging to any criminal street gang, including Rollin 20's, but he admitted he had family in Rollin 20's. Valerio claimed he had once gone to Anaheim with his sister. He said they went to a club and he got drunk. They also stopped at a restaurant, perhaps

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436

a Denny's, to use to the restroom. Valerio said that when he walked out of the restroom, he heard gunshots and ran outside to catch a ride home with his sister. He admitted seeing Brown, his cousin, at the club, but he also said, "I didn't kill nobody."

Kelly also submitted to a police interview. At first, Kelly denied ever having been to the Boogie nightclub, denied participating in the robbery, and claimed to have been working on the night of the shootings. He also denied being a Rollin 20's gang member, although he admitted claiming the gang in his youth.

Later in the interview, Kelly admitted going to the Denny's. He said he went into the restroom and heard someone say "20's" and "Insane." When he came out of the restroom, Kelly said he saw a group of guys beating someone else. He did not know who they were, and he left the Denny's to sit in a car with some girls. While they were sitting in the car, Kelly heard gunshots and saw a heavyset guy come out of the Denny's with a gun in his hand. Kelly denied knowing Hill and denied having a gun.

*3. Hill's Testimony*

Hill testified in exchange for potential "consideration" in his own case. He admitted associating with the Rollin 20's. He grew up near Brown and her cousin, Kelly. Hill claimed Brown and Valerio were Rollin 20's associates while Reynolds, Simon, Hartley, and Kelly were Rollin 20's members.

Hill testified he and four or five carloads of people from Long Beach decided to go to the Boogie on the night Jones was killed. After the nightclub closed, Brown, Hill, Simon, Kelly, Reynolds, Valerio, and Calvin Thomas, all members or associates of the Rollin 20's, decided to go to Denny's. They all went inside the men's restroom. Hill said Simon had a revolver, Reynolds had a chrome .357-caliber gun, and Kelly had a nine-millimeter semiautomatic.

According to Hill, Simon pointed a gun at Washington's face, while Brown, Reynolds, and Kelly took his property. He saw Brown with Washington's gold chain and cell phone. Valerio and Thomas were in the restroom stall with Boyd. Hill

6

said one of the victims recognized Kelly and said something.  He also remembered hearing Reynolds yell, "20's."

Hill claimed he walked out of the restroom when Jones walked in.  He heard Jones ask, "What the hell is going on?"  When Reynolds demanded Jones's gold chain, Jones refused.  Jones hit Reynolds after Reynolds forcibly removed the gold chain from around his neck.

When Hill got to the parking lot, he saw Spencer come out of the restaurant, and heard him yell, "You a'll robbed my homeboys" while waving a gun in the air.  Hill thought Spencer was shooting at him because he had been involved in the robbery, but he did not actually see where Spencer aimed his gun.  Hill hid between two cars as several shots were fired from various locations.  When Jones came outside, Hill saw Reynolds fire his .357-handgun and Kelly his nine-millimeter at him, but Hill testified he saw Reynolds shoot Jones.  Jones grabbed his chest and stumbled back inside the Denny's and died.

Once the shooting stopped, Hill, Simon, and Kelly fled in the same car.  According to Hill, Simon looked "all shocked and traumatized."  He further testified that Simon said, "I domed that nigga."  Hill understood Simon to mean he had shot someone in the head.  In fact, Spencer had been shot in the head.  The bullet entered his head above his left ear, traveled under the skin along the skull, and exited through the back of Spencer's head.

Hill also testified that during the trial he, Kelly and Valerio had been put into adjacent holding cells.  Kelly insisted on communicating with Hill despite Hill's attempts to ignore him.  Hill testified Kelly used hand signs to threaten him, and verbally threatened him.  According to Hill, Kelly hand signed, "Don't do it.  That ain't true.  I thought we was boys.  I thought you was my boy.  They don't got nothing on me.  The case rests on you.  The ball is in your court," and "Hey, they snitching on you, too, so why are you doing this?"  Hill also testified Kelly verbally asked him about his sister and

7

then said, "Man, you see what happened to your sister. You don't want this kind of shit to keep happening, do you?" Hill's sister had died prior to Hill testifying at another, related trial. Kelly also told Hill that he knew where Hill's grandmother lived. The jury saw the holding cell surveillance tape, but the tape did not have audio.

*4. Gang Expert Testimony*

Long Beach Police Detective Sean Magee testified as the prosecution's gang expert. Magee stated the Rollin 20's gang was formed between 1978 and 1981. The gang claims an area of east Long Beach as its territory. The members identify with the colors black and yellow or gold, and often wear clothing with the Pittsburgh Steelers or Pirates logo.

As of March 17, 2006, the gang had up to 500 active members, and their primary activities were the commission of murders, robberies, assaults with deadly weapons, and the illegal distribution of narcotics. Magee testified about two crimes committed by other Rollin 20's members, Anthony Wayne Clarke and Tracy Vaughn Paul. Clarke committed murder and attempted murder in December 2005, and Paul had been convicted of murder, possession of a firearm by a felon, and street terrorism for a separate incident in December 2005.

In Magee's expert opinion, Brown, Reynolds, Simon, Valerio, Hill, and Kelly were active participants in the Rollin 20's on March 17, 2006, and the instant crimes were committed for the benefit of, at the direction of, or in association with the gang.

**DISCUSSION**

*1. Sufficiency of the Evidence*

    *a. Introduction*

Defendants challenge the sufficiency of the evidence to prove both special-circumstance findings. For the gang-related murder special circumstances, defendants assert the prosecution failed to prove they had the intent to kill Jones as required under

8

Penal Code, section 190.2, subdivision (a)(22)[3] (enhanced penalty for defendant who intentionally kills while an active participant in a criminal street gang and to further the activities of the gang).  The Attorney General concedes the issue as to Valerio by acknowledging the paucity of evidence Valerio, an admitted Rollin 20's gang member who actively participated in the robberies, had any role in the shooting.  We agree with this concession.  However, we conclude substantial evidence supports the gang-related murder special circumstance for Kelly, and the robbery-murder special circumstance for both defendants.

### b. *Standard of Review*

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]"  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

### c. *Felony-Murder Special-Circumstance Evidence*

Pointing to *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), defendants assert the evidence is insufficient to prove they were "'major participants'" in the robberies, or that they acted with "'reckless indifference to human life.'"  They assert the prosecution failed to prove they either planned to kill Jones and Spencer, or that they actively participated in a violent felony.  We disagree.

*Tison*, *supra*, 481 U.S. 137, concerned the requirements of the Eighth Amendment to the United States Constitution for the felony-murder defendant who was

_____

[3]  All further statutory references are to the Penal Code.

not the actual killer. The Supreme Court had previously addressed that issue in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*).

In *Enmund*, the defendant's accomplices killed two people during an armed robbery at a farmhouse, while the defendant waited nearby in the getaway car. The defendant was convicted of first degree murder and sentenced to death. The United States Supreme Court reversed, stating the death penalty may not be imposed for a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, *supra*, 458 U.S. at p. 797.) The court stressed the importance of individual culpability under the Eighth Amendment, and then concluded the non-killer defendant did not harbor the intent to kill, and therefore his culpability could not be equated with that of the actual killers. (*Enmund*, at p. 798.)

In *Tison,* the Supreme Court held the Eighth Amendment does not preclude imposition of the death penalty on a defendant who neither killed nor intended to kill during a felony murder, if the defendant was an active participant in the felony and acted with reckless disregard for human life. (*Tison*, *supra*, 481 U.S. at p. 158.) The defendants in *Tison* were eligible for the death penalty because they brought guns into a prison to help their father, a convicted murderer, escape; they assisted their father and his former cellmate in committing a carjacking that included kidnapping four victims; and they stood nearby while their father and the cellmate killed the four victims.

The Supreme Court summarized the case's unusual and horrific facts, concluding the defendants must have "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Tison*, *supra*, 481 U.S. at p. 152.) *Tison* expressly held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."

10

(*Id.* at pp. 157-158.) In short, the Supreme Court found the defendants eligible for the death penalty based on evidence of "major participation in the felony committed, combined with reckless indifference to human life . . . ." (*Id.* at p. 158, fn. omitted.)

Here, Hill and Washington testified Kelly actively participated in the robberies. And, while Washington and Boyd did not see Kelly with a gun in the restroom, Hill testified Kelly possessed and exhibited a nine-millimeter gun during the robbery and shooting. Hill also testified Kelly fired the nine-millimeter in Jones's general direction during the gun battle. This act alone is sufficient to create a strong inference of the intent to kill. (See *People v. Smith* (2005) 37 Cal.4th 733, 741; *People v. Lashley* (1991) 1 Cal.App.4th 938, 945.) Washington identified Kelly and asked for consideration, but Kelly denied knowing Washington and did nothing to stop his confederates. This evidence also tends to prove Kelly was an active participant in the robberies. Valerio, too, was an active participant in the robberies. He confronted Boyd in the restroom stall, asked Boyd's gang affiliation, and demanded Boyd turn over all his possessions. Therefore, substantial evidence supports a finding Valerio and Kelly were active participants in the robberies.

In addition, the fact Kelly and Valerio participated in gang-related armed robberies establishes their reckless indifference to human life. The "reckless indifference" element can be proved solely by the circumstances of the current offense. (See *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754-1755 [defendant knew accomplice had a knife, defendant saw accomplice stab victim without trying to intervene and then fled with co-perpetrators and robbery loot, leaving victim to die]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant who helped plan armed robbery at drug dealer's house "had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result"]; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 580 [defendant "had to be aware use of a gun to effect the robbery presented a grave risk of death," but "instead of coming to the victim's aid after the first

11

shot, he instead chose to assist [actual killer] in accomplishing the robbery"].) The robbery and shooting demonstrate a cold indifference to other people's lives and property. Consequently, we conclude substantial evidence supports the jury's finding on the felony-murder special circumstance as to both Kelly and Valerio.

### d. Gang-Related Murder Special-Circumstance Evidence

Defendants also challenge the sufficiency of the evidence to prove the criminal street gang special circumstance finding (§ 190.2, subd. (a)(22)). In order to sustain a true finding, the prosecution must prove beyond a reasonable doubt defendants, while active participants in a criminal street gang, either committed or aided and abetted another person to commit murder in the first degree, with the intent to kill and to further the activities of his gang. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611.) As noted, the Attorney General concedes the issue as to Valerio. Thus, the gang-related murder special-circumstance finding must be reversed as to him.

With Kelly, however, Hill testified Kelly *and* Reynolds fired shots in Jones's general direction. As noted, the act of firing a gun at someone else establishes a strong presumption the defendant has the intent to kill. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 741; *People v. Lashley*, *supra*, 1 Cal.App.4th at p. 945.)

Other evidence supports this presumption. Magee and Hill testified Kelly was an active Rollin 20's gang member. In addition, Magee testified the primary activities of Rollin 20's included the commission of murder and attempted murder. From this evidence a reasonable inference can be made that Kelly and his fellow gang members committed robbery, murder, and attempted murder with the intent to further their gang's criminal activities. In sum, substantial evidence supports the jury's true finding on the gang-related murder special circumstance as to Kelly.

### 2. Jury Instructions

Defendants claim the trial court had a duty to give CALCRIM No. 240, an instruction on causation, because Spencer's actions constitute an intervening cause of

Jones's death, which cuts off all liability for the crime.  They also claim the trial court erred by not giving self-defense instructions, by improperly giving an instruction to ignore Hill's custody status and restraints and an instruction on motive as it applies to the street terrorism charge, and by failing to modify the instruction on the gang-related murder special circumstance.  None of these contentions has merit.

### a. General Principles

A trial court must instruct on "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.  [Citations.]"  (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  In addition, the trial court must instruct upon "every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case.  [Citations.]"  (*Ibid.*)

On appeal, "[w]e determine whether a jury instruction correctly states the law under the independent or de novo standard of review.  [Citation.]  Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.'  [Citation.]  '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.]  'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'  [Citation.]"  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  "An appellate court can address an incorrect instruction to which no objection was made at trial if the instruction impaired the defendant's substantial rights.  [Citation.]"  (*People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1138-1139 (*Fuentes*).)

13

### b. *Causation Instruction*

Defendants argue Spencer's allegedly unlawful intervention in the robbery constitutes an independent intervening cause of Jones's death that cuts off liability for Jones's murder. They contend Spencer's intervention triggered the court's sua sponte duty to instruct the jury with CALCRIM No. 240 on causation. We disagree.

In *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*), the California Supreme Court had occasion to discuss causation in the context of a provocative act murder prosecution. (*Id.* at p. 866.) The court stated, "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Id.* at p. 871.)

In *Cervantes*, members of different gangs attended the same party. The defendant, a member of the Highland Street gang, shot a member of the Alley Boys gang (Linares) in the arm and chest during a scuffle over a perceived slight to a woman associated with the Alley Boys. (*Cervantes*, *supra*, 26 Cal.4th at pp. 863-864.) A melee erupted with several participants yelling gang challenges. (*Ibid.*) A short time later, a group of Alley boys spotted a lone Highland Street gang member (Cabrera) and fired

14

several shots, killing him. (*Id.* at p. 864.) At trial on charges he killed Cabrera, the defendant testified he did not intend to shoot anyone, and that he was driving away from the party when he heard several shots being fired. (*Ibid.*)

The California Supreme Court reversed the defendant's conviction, observing, "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered." (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fns. omitted.) The court observed, Cabrera's murderers "'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' [Citations.]" (*Id.* at p. 874.)

Here, unlike *Cervantes,* Spencer took it upon himself to protect his friends during the course of a robbery, but there is no evidence he sought to exploit the situation caused by Kelly, Valerio, and their fellow gang members. In our view, Spencer stands in the shoes of a victim of the robbery or a responding police officer, and should not be considered an intervening or superseding cause cutting off Kelly or Valerio's liability for Jones's death. (See *Cervantes*, *supra*, 26 Cal.4th at p. 868; see also *People v. Gilbert* (1965) 63 Cal.2d 690, 704-705 [police officer kills accomplice] reversed on grounds not relevant here *sub nom. Gilbert v. California* (1967) 388 U.S. 263.)

Under established principles of causation, "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 847.) A shooting death during a gang-related armed robbery like this is a reasonably

15

foreseeable risk, not an extraordinary or abnormal occurrence. By way of contrast, if an airplane had fallen from the sky and killed Jones, defendants' argument would have merit. But here we see no reason for absolution simply because the victim's friend intervened as opposed to one of the victims himself or a responding peace officer.

The evidence shows defendants participated in two armed robberies in which more than one perpetrator possessed a gun. The crimes took place in a busy restaurant. Although a bystander's violent intervention was not inevitable, Spencer's involvement in the robbery is hardly the type of occurrence so remote and unusual that it would cut off the criminal liability of one of the robbery participants. "[I]t is impossible to see how it could reasonably be concluded that the death[] of [Jones] in such circumstances could have been an unnatural or improbable consequence of appellants' admitted acts." (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1662.)

Defendants further argue Spencer's acts were not legally justifiable, and thus they cannot be liable for the robbers' reaction to Spencer's independent, illegal, and lethal conduct. They have cited no authority for the proposition an intervening act cuts off liability unless the intervening act is both foreseeable *and* legally justifiable. Furthermore, we are not prepared to find that his acts fall outside of section 197's provision for justifiable homicide when the life of another is threatened, or as a justified act to apprehend those who had just robbed his friend. (See § 197, subds. (1), (4).)

Finally, as Kelly and Valerio concede, the court gave CALCRIM No. 540B, which required the jury to find, among other things, a "logical connection" between the cause of Jones's death and the robbery, and that the connection between the robbery and murder was more than just their occurrence at the same "time and place." (See *People v. Cavitt* (2004) 33 Cal.4th 187, 201 [to satisfy the "complicity aspect" of the felony-murder rule, a nonkiller is responsible for a homicide committed by a cofelon when there is "a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in

16

death"].)  And, as the Attorney General notes, the trial court also gave CALCRIM Nos. 549 and 730, which informed the jury defendants could be convicted of felony murder only if it determined the act causing Jones's death and the robberies were part of one continuous transaction.  Thus, there was no sua sponte obligation to instruct the jury with CALCRIM No. 240 on causation.

### c. Self-defense Instruction

Defendants argue the trial court erred by not instructing the jury on self-defense as it relates to counts 1 and 2.  They claim substantial evidence supported giving a self-defense instruction based on Spencer's intervention in robbery.  We are not persuaded.

In general, no claim of self-defense, reasonable or unreasonable, may be made in murder prosecutions based on the felony-murder rule.  (*People v. Dillon* (1983) 34 Cal.3d 441, 475-476.)  This is because malice is eliminated as an element in such cases.  (*People v. Robertson* (2004) 34 Cal.4th 156, 164-165, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)  "The purpose of the felony-murder rule is to deter even accidental killings in the commission of designated felonies by holding the felon strictly liable for murder.  [Citation.]  When a burglar kills in the commission of a burglary, he cannot claim self-defense, for this would be fundamentally inconsistent with the very purpose of the felony-murder rule.  [Citations.]"  (*People v. Loustaunau* (1986)181 Cal.App.3d 163, 170.)

Defendants acknowledge the general rule, but claim Spencer's intervention and use of deadly force produces a different result here.  They admit "the factual scenarios under which ordinary or reasonable self-defense would apply to a killing that occurs in the course of a felony are extremely rare," but argue Spencer's intervention created just such a rare circumstance.  They cite no legal authority for this proposition, nor do they cite a single case that chips away at the general rule.  Failure to cite any relevant authority in support of an assertion results in a waiver of the right to appellate

17

review of that assertion. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *People v. Diaz* (1983) 140 Cal.App.3d 813, 824.)

Furthermore, as discussed above, Spencer's intervention does not cutoff defendants' liability for the crimes. We have concluded Spencer's action, although unusual, was a reasonably foreseeable risk of an armed robbery and not an extraordinary or abnormal occurrence. Similarly, Spencer's intervention did not create a situation where defendants could claim self-defense in shooting Jones or Spencer. Consequently, the trial court was under no duty to give a self-defense instruction at this trial.

### d. Custody Status and Restraint Instruction

Defendants claim the trial court erred and "undercut the defense" by instructing the jury with CALCRIM No. 337. This instruction told the jury to "completely disregard" the fact Hill was restrained and in custody when he testified. Defendants believe CALCRIM No. 337 precluded the jury from properly assessing Hill's credibility. Not so.

As noted, we do not judge instructions in isolation. Rather, we review a claim of instructional error in the context of the whole charge to the jury. (*Fuentes*, *supra*, 171 Cal.App.4th at pp. 1138-1139.) Here, the trial court instructed the jury with CALCRIM No. 226. That instruction states the jury alone judges credibility, and it explains that when deciding credibility, the jury is permitted to consider a whole host of factors. The trial court also gave CALCRIM No. 335, which explained how to evaluate accomplice testimony and specifically told the jury Hill was an accomplice. And, the trial court gave CALCRIM No. 316, which permits the jury to consider prior felony convictions when determining credibility. When considered together, the instructions on witness credibility were legally accurate and factually applicable, including CALCRIM No. 337. Thus, it is not reasonably likely the jury applied CALCRIM No. 337 in a way that prevented the consideration of constitutionally relevant evidence. (*Boyde v. California* (1990) 494 U.S. 370, 380-381.)

18

### e. Motive and Street Terrorism Instruction

Defendants also contend the trial court erred by giving CALCRIM No. 370, which advises the jury, "The People are not required to prove that the defendant had a motive to commit any of the crimes charged." They contend CALCRIM No. 370 as applied to the crime of street terrorism amounts to instructing the jury the prosecution need not prove defendants' intent. Again we disagree.

In *Fuentes*, *supra*, 171 Cal.App.4th at pages 1139-1140, the appellate court rejected the defendants' objection to CALCRIM No. 370 as it relates to street terrorism: "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent. We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death. Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so. This was not ambiguous and there is no reason to think the jury could not understand it."

Defendants claim *Fuentes* is flawed because the appellate court did not discuss and apply cases discussing motive in the context of the financial gain special circumstance. However, none of the cases cited by defendants are on point, and the Supreme Court has held the terms "intent" and "motive" are not interchangeable. (See, *e.g., People v. Carasi* (2008) 44 Cal.4th 1263, 1308-1309; *People v. Staten* (2000) 24 Cal.4th 434, 461; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1026-1027.) In defendants' view, the motive to gain financially from a murder is no different from an intent to do so. The problem with defendants' analogy is that the Supreme Court repeatedly has rejected it. (*Edelbacher*, at p. 1027; *People v. Riggs* (2008) 44 Cal.4th 248, 314; *People v. Crew* (2003) 31 Cal.4th 822, 845; *People v. Noguera* (1992) 4 Cal.4th 599, 637.)

As the *Fuentes* court has explained: "If Fuentes's argument has a superficial attractiveness, it is because of the commonsense concept of a motive. Any

19

reason for doing something can rightly be called a motive in common language, including—but not limited to—reasons that stand behind other reasons. For example, we could say that when A shot B, A was motivated by a wish to kill B, which in turn was motivated by a desire to receive an inheritance, which in turn was motivated by a plan to pay off a debt, which in turn was motivated by a plan to avoid the wrath of a creditor. That is why there is some plausibility in saying the intent to further gang activity is a motive for committing a murder: A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason. The jury instructions given here, however, were well adapted to cope with the situation. By listing the various 'intents' the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons. This was done without saying anything that would confuse a reasonable juror." (*Fuentes*, *supra*, 171 Cal.App.4th at p. 1140.)

In short, motive describes the reason a person decides to commit a crime. The reason for doing something, however, is different from the required mental state for criminal liability. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504.) The jury was instructed here pursuant to CALCRIM No. 1400 on the elements of street terrorism. This instruction stated the crime required the jury to find defendants were active participants in Rollin 20's, that they participated in the gang knowing other members of the gang engaged in criminal activity, and that defendants "willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang." The trial court's street terrorism instruction did not use the word "motive" and there is no indication the jury would have understood the terms "motive" and "intent" to be interchangeable. Just as in *Fuentes,* there was no error here.

20

*f. Gang-Related Murder Special-Circumstance Instruction*

Defendants claim the trial court's instruction on accomplice liability as to the gang-related murder special circumstances did not specify the prosecution's burden of proving they had the intent to kill. The Attorney General asserts defendants forfeited this challenge to the jury instructions because it is the defendants' duty to request modification of the instructions, citing *People v. Guiuan* (1998) 18 Cal.4th 558. However, the Attorney General also concedes the evidence is insufficient to support the jury's gang-related murder special-circumstance finding on Valerio. We address the issue on the merits, but find Kelly's argument unavailing.

Section 190.2, subdivision (a)(22) provides for a sentence of death or life without the possibility of parole for first degree murder when "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." Subdivision (c) extends liability for first degree murder to "[e]very person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree . . . ." (See also *People v. Mejia*, *supra*, 211 Cal.App.4th at p. 611.)

The trial court gave CALCRIM No. 736, which told the jury the prosecution had to prove beyond a reasonable doubt "defendant intentionally killed Armond Jones" with respect to the gang murder special circumstance. The same language is in the verdict form. Kelly assumes the jury would disregard the language of the instruction and verdict form to find him guilty without necessarily concluding he had the intent to kill Jones. Nothing in the record supports this assumption, and it seems unlikely the jury interpreted the instruction in the way Kelly believes. As the Attorney General notes, the trial court properly instructed the jury on aiding and abetting and coconspirator liability. Viewing the instructions as a whole, we conclude there is no reasonable probability the jury misunderstood the instruction on accomplice liability as to

21

the gang-related murder special circumstances to permit a true finding without finding Kelly had the required intent to kill. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

*3. New Trial Motions*

*a. Introduction*

Defendants challenge the trial court's denial of their motion for new trial based on newly discovered evidence. (§ 1181, subd. (8).)[4] Defendants contend the trial court's ruling violated their due process right to a fundamentally fair trial under the Fifth and Fourteenth Amendments of the United States Constitution and article I of the California Constitution.

*b. Legal Principles*

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328; see also *People v. Soojian* (2010) 190 Cal.App.4th 491, 512.)

"'"'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'" [Citations.] '"[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.'" [Citation]." (*People v. Delgado*, *supra*, 5

<hr/>

[4] "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] (8) When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial . . . ." (§ 1181, subd. (8).)

Cal.4th at p. 328.) A new trial motion based on newly discovered evidence is looked upon with disfavor. We will only disturb a trial court's denial of such a motion if there is a clear showing of a manifest and unmistakable abuse of discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1251-1252; *Delgado*, *supra*, 5 Cal.4th at p. 328.)

### c. Factual Background

After the prosecutor made her closing argument, Kelly's attorney told the court he had just learned about a witness who would testify Kelly never carried a gun and that Hill had a reputation for always carrying a nine-millimeter handgun. According to counsel, Omar Houston, one of Kelly's best friends, had only recently come forward with this information. Defense counsel moved to reopen his case, but the trial court found the request untimely and denied the motion.

In July 2012, Kelly filed a new trial motion and Valerio orally joined in it. Kelly alleged two new witnesses had recently come forward, Shamarra Frazier, Hill's former girlfriend, and Valerio's sister, Shawndrika Brown. Kelly claimed Houston had called Kelly's parents and told them Frazier wanted to come forward and testify Hill always carried a nine-millimeter handgun. Frazier also claimed to have seen bullet holes in the side of Hill's Camaro and shell casings on the floor of his car the day after the shooting.

Shawndrika Brown also let it be known she was now "prepared to talk about what she saw at Denny's." Apparently, Houston, Frazier and Shawndrika Brown thought Hill got too good a deal and justice had not been served.

Kelly asserted Hill's testimony alone placed a gun in his hands, and Houston, Shawndrika Brown, and Frazier's statements had considerable impeachment value with respect to Hill's testimony. The trial court disagreed.

In denying defendants' new trial motion, the trial court stated, "So as I assess the new evidence, I cannot find that it is new evidence truly in that the witnesses were known. I expressed my reservation. And again, I'm not suggesting counsel didn't

23

do what they needed to do. [Valerio's counsel] said he spoke to the one witness himself twice and she wasn't interested in cooperating even though her brother was on trial. And suddenly after trial, after conviction, after four trials, in fact, and five convictions, she crawls out of the woodwork with some new information. [¶] . . . [¶] So I don't think any of this new evidence is truly new evidence in the sense that the law considers new evidence . . . although I do believe it's material, I think it's largely cumulative for the reasons I've now expressed several times."

Having considered the record as a whole, we agree with the trial court. Houston, Frazier and Shawndrika Brown had close ties to defendants, and defendants knew their whereabouts many years before trial began. Thus, Houston, Shawndrika Brown and Frazier were not newly discovered witnesses.

Moreover, their testimony was cumulative of other challenges to Hill's credibility, including his impeachment with a prior felony conviction, which the defense properly exploited at trial. (*People v. Delgado*, *supra*, 5 Cal.4th at p. 329 ["'the trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable'"].) Furthermore, the jury instructions identified Hill as an accomplice to the crimes, and the trial court gave special instructions to the jury about the special dilemma accomplice testimony presents.

Finally, even if Houston, Frazier, and Shawndrika Brown's testimony could be considered "new evidence" for purposes of section 1181, subdivision (8), defendants have nonetheless failed to demonstrate there is a reasonable probability their testimony would have led to a different result. Under these circumstances, the trial court acted well within the scope of its broad discretion in finding the proffered evidence was not new and was cumulative of other evidence. (See *People v. Delgado*, *supra*, 5 Cal.4th at p. 328.) Accordingly, the trial court's decision to deny defendants' new trial motion must be affirmed.

24

*4. Cumulative Error*

Defendants contend a combination of errors rendered their trial fundamentally unfair. We have individually considered each claim of error in this four-week trial, which generated over 1,600 pages of reporter's transcript. The few errors that occurred were harmless under any standard, whether considered individually or collectively. We find no deprivation of rights guaranteed under either the state or federal Constitutions. Defendants were "entitled to a fair trial, not a perfect one. [Citation.]" (*People v. Box* (2000) 23 Cal.4th 1153, 1214, overruled on other grounds in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) They received a fair trial.

*5. Sentencing*

*a. Eighth Amendment Claim*

At sentencing, the trial court expressed an interest in reducing Valerio's LWOP sentence. However, the trial court felt constrained by section 1385.1's prohibition against striking "any special circumstance which is . . . found by a jury." (See also *People v. Mendoza* (2011) 52 Cal.4th 1056, 1075.) In musing about the situation, the trial court indicated a willingness to take "additional evidence, even testimony, concerning the propriety of me possibly giving [Valerio] a sentence other than life without possibility of parole . . . ."

Valerio did not assert an Eighth Amendment claim below, but raises it now. The Attorney General claims we need not remand for a new sentencing hearing because an application of constitutional principles outlined in *People v. Dillon*, *supra*, 34 Cal.3d at page 479 would yield no different result. We disagree.

The court had access to the probation report, which mentioned Valerio's relative youth at the time of the crime (19 years old), minimal criminal record, and comparatively minor role in the robberies suggested leniency could be appropriate in his case. The court was familiar with the facts of the case, which demonstrated Valerio's nonleadership role in the crimes and proved he neither personally possessed nor used a

25

firearm. The trial court also stated if the matter is remanded for a new sentencing hearing there were other facts the court would be willing to consider. We agree these facts could be important to the resolution of the constitutional claim. Therefore, we remand for a new sentencing hearing to allow the trial court to consider the constitutionality of Valerio's sentence and exercise its sentencing discretion in the first instance.

### b. Other Sentencing Errors

The parties agree the trial court made certain sentencing errors and the judgments must be modified. With respect to Kelly, the sentence is modified as follows: (1) count 5 is stayed under section 654 because the murder, attempted murder and robberies were the basis for the felonious criminal conduct promoted, assisted or furthered by Kelly (*People v. Mesa* (2012) 54 Cal.4th 191, 197-198); (2) only one LWOP term may be imposed on count 1 (§ 190.2, subd. (a)); and, (3) only one section 12022.53 enhancement penalty may be imposed on counts 1 and 2 (§ 12022.53, subd. (f)). As modified, Kelly's judgment is affirmed.

For Valerio, while the gang-related murder special circumstance is stricken for insufficiency of the evidence, all other convictions and findings are affirmed. Because his sentence is being reversed and the matter remanded, his sentence may be modified to meet constitutional muster. If not, the sentence must be modified as follows: (1) count 5 must be stayed under section 654 because the murder, attempted murder and robberies were the basis for the felonious criminal conduct promoted, assisted or furthered by Valerio (*People v. Mesa*, *supra*, 54 Cal.4th at pp. 197-198); (2) only one LWOP term may be imposed on count 1 (§ 190.2, subd. (a)); (3) only one section 12022.53 enhancement penalty may be imposed on counts 1 and 2 (§ 12022.53, subd. (f)); and, (4) the sentence enhancements under section 186.22, subd. (b) must be stayed because there is no evidence Valerio personally used or discharged a firearm (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238).

26

# DISPOSITION

With respect to Valerio, the gang-related murder special circumstance is reversed. As modified, Valerio's judgment of conviction is affirmed, the sentence is reversed, and the matter remanded for a new sentencing hearing to permit the trial court to consider the constitutionality of Valerio's sentence. If Valerio's sentence is not otherwise modified following that sentencing hearing, then the current sentence shall be modified as noted above and the abstract of judgment shall be corrected.

For Kelly, the sentence is modified as set for above. As modified, the judgment against Kelly is affirmed.

The clerk of the superior court is directed to correct the abstracts of judgment and forward copies to the Department of Corrections and Rehabilitation.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

27